UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

FLOYD RONALD BURKE,
on behalf of himself and others
similarly situated

                        Plaintiffs,

v.

NATIONSTAR MORTGAGE, LLC, *et al.*,

                        Defendants.

Civil Action No. 3:14–CV–837

## MEMORANDUM OPINION

THIS MATTER is before the Court on a Motion to Dismiss ("Motion") filed by Defendants Nationstar Mortgage, LLC ("Nationstar") and EverBank, a federal savings association ("EverBank")[1] (collectively, "Defendants"). ECF No. 11. Plaintiff Floyd Ronald Burke ("Plaintiff"), on behalf of himself and others similarly situated, opposes the Motion. ECF No. 18. For the reasons stated below, the Court will GRANT IN PART and DENY IN PART Defendants' Motion.

### I. PROCEDURAL HISTORY

On December 16, 2014, Plaintiff filed a seven-count Class Action Complaint in this Court. Plaintiff alleges the following: "breach of contract for breach of [the] implied covenant of good faith and fair dealing," ("Count I"), a class claim ("Count II") as well as an individual claim ("Count III") for violations of the Federal and Virginia Equal Credit Opportunity Act ("ECOA") ("Count II"), violation of the Real Estate Settlement and Procedures Act ("RESPA") ("Count IV"), violations of the Fair Debt Collection Practices Act ("FDCPA") ("Counts V and VI"), and breach of contract ("Count VII"). On March 13, 2015, Defendants moved to dismiss Count I,

---

[1] According to Defendants, Plaintiff Floyd Ronald Burke ("Plaintiff") incorrectly named "EverBank Financial Corporation and Everhome Mortgage, LLC" in the Complaint. *See* Defendants' Memorandum In Support of Their Motion to Dismiss Plaintiff's Class Action Complaint ("Defs.' Mem.") at 1, n.1.

1

Count III, and Counts V and VI.[2] ECF No. 11. Plaintiff filed a Response on April 17, 2015, in which he voluntarily withdrew Counts V and VI, the FDCPA claims, alleged in the Class Action Complaint. ECF No. 18. On April 30, 2015, Defendants filed a Reply. ECF No. 21. This matter is now ripe for review.

## II. FACTUAL BACKGROUND

Plaintiff purports to represent a class of homeowners who have been damaged by Nationstar's alleged failures to comply with applicable law in connection with their mortgage loan modification requests.

The following is taken from the facts as set forth in Plaintiff's Complaint, which the Court takes as true in reviewing Defendants' Motion to Dismiss. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). In June of 2008, Plaintiff "executed a Note in the principal sum of $ 101,246.00 and Deed of Trust secured by his primary residence and backed by the Federal Housing Administration ('FHA')." Complaint ("Compl.") ¶ 14. After Plaintiff executed the loan documents, "Bank of America acquired the servicing rights for [his] mortgage" on or about July 1, 2008. *Id.* ¶ 23. In 2011, Plaintiff "experienced financial hardship due primarily to divorce" and "filed [for] Chapter 7 bankruptcy," but "filed a Statement of Intention to reaffirm his mortgage debt to Bank of America." *Id.* ¶¶ 24-25. When Plaintiff received his bankruptcy discharge in November of 2011, he was "current on his mortgage." *Id.* ¶ 26.

On November 14, 2012, Plaintiff, still "current on his mortgage" payments of "757.27 per month," applied to Bank of America for a new loan in the form of "a loan modification." *Id.* ¶¶ 27-28. Subsequently, "[b]y letter dated November 20, 2012, Bank of America informed [Plaintiff] that it had received his application for loan modification and requested additional income documentation, which [he] immediately provided." *Id.* ¶ 30. Thereafter, "Bank of America notified [Plaintiff] that servicing of the loan had been transferred to Nationstar

---

[2] Plaintiff withdraws Counts V and VI, which are the Fair Debt Collection Practices Act ("FDCPA") claims. Plaintiff's Opposition to Defendants' Motion to Dismiss the Class Action Complaint ("Pl.'s Opp'n") at 1, n.1.

beginning December 4, 2012." *Id.* Plaintiff then started "making payments of $739.90 to Nationstar."[3] *Id.* ¶¶ 31. "In January 2013, [Nationstar] sent a letter to [Plaintiff] offering review for Home Affordable Modification Program (HAMP)," to which Plaintiff responded by "submitt[ing] the completed application and required documents." *Id.* ¶ 32. On "February 2, 2013, Nationstar Mortgage sent a letter to [him] stating he was in default for the January 1, 2013 and February 1, 2013 payments." *Id.* ¶ 33.

Plaintiff alleges that in "[i]n May 2013, his mortgage payment increased to $747.28 per month." *Id.* ¶ 34. On May 2013, Nationstar informed Plaintiff that "he had been approved to enter into a Trial Period Plan . . . under the FHA HAMP Modification Program." *Id.* ¶ 35. Specifically, Plaintiff alleges that the letter approving the TPP provided:

> Congratulations! You are approved to enter into a trial period plan under the FHA HAMP Modification Program. This is the first step toward qualifying for more affordable mortgage payments. Please read this letter so that you understand all the steps you need to take to modify your mortgage payments.

*Id.* ¶ 36. With respect to payments, according to Plaintiff, the letter from Nationstar instructed:

> **What you need to do** . . . To accept this offer, you must make new monthly "trial period payments" in place of your normal monthly mortgage payment. Send your monthly trial period payments instate [sic] of your normal monthly mortgage payment as follows:
> - 1st payment:      $575.40 by 7/1/2013
> - 2nd payment:    $575.40 by 8/1/2013
> - 3rd payment:    $575.40 by 9/1/2013
> - 4th payment:    $575.40 by 10/1/2013

*Id.* ¶ 37. During the trial period, Plaintiff alleges that "he made all four payments of $575.40, due July 1, August 1, September 1, and October 1." *Id.* ¶ 38. However, during this trial loan modification period, Plaintiff continued to receive monthly statements from Nationstar in the amount of $747.28 per month. *Id.* The Complaint provides that upon Plaintiff contacting Nationstar to "inquire about the correct amount that should be paid for the mortgage," a

---

[3] The Complaint does not provide why Plaintiff began making payments in the amount of $739.90 instead of $757.27 (*i.e.*, the amount Plaintiff alleges he was paying in November prior the loan being transferred from Bank of America to Nationstar).

"Nationstar representative informed [Plaintiff] not to worry about the amount that was in his monthly statements" and instructed him to "continue to pay per the TPP instructions." *Id.* ¶ 39.

In November 2013, after completing the trial loan modification, Plaintiff "received permanent Loan Modification documents from Nationstar," which he "signed and notarized" before sending them back to Nationstar. *Id.* ¶¶ 41, 42. Plaintiff alleges that the documents provided that his modified mortgage payment would be $569.42 per month. *Id.* ¶ 41. Plaintiff continued to receive "Notice[s] of Default and Intent to Accelerate" although he "continued to make timely payments" in the amount of $575.90. *Id.* ¶¶ 43-45, 49, 51, 53. Plaintiff asserts that he called Nationstar "numerous times regarding the notices of default and always got a different Nationstar representative who gave him a different answer." *Id.* ¶ 46. Plaintiff made "three payments of $575.90 during the month of February 2014 based on his concern that he kept getting conflicting information from the Nationstar representatives" and receipt of "threats by Nationstar of its intent to accelerate." *Id.* ¶ 48; *see also id.* ¶¶ 49-53.

On March 19, 2014, "Nationstar sent a letter to [Plaintiff] advising [that] he ha[d] been denied a loan modification" for the following reason: "Denial Reason: Offer Not Accepted by Borrower/Request Withdrawn." *Id.* ¶ 54. After receiving the correspondence, denying his loan modification, Plaintiff called Nationstar and "spoke with Laura, who stated that he didn't qualify for trial loan modification because he didn't make the payments." She further "stated that Loan Modification documents were filled out incorrectly, notarized incorrectly, [and] missing [a] notary stamp." *Id.* ¶ 57.

By letter dated June 17, 2014, Plaintiff received a letter "from the Law Offices of Shapiro Brown & Alt, LLP" ("SBA"), notifying Plaintiff that the firm had "been retained to initiate foreclosure proceedings to foreclose the Deed of Trust/Mortgage on his property." *Id.* ¶ 70. "By letter dated July 8, 2014, Nationstar sent to [Plaintiff] a letter" informing him that he could "request the option for a face to face meeting with a Nationstar representative . . . within 30 days of the date of" the letter. *Id.* ¶ 92. Plaintiff requested "a face-to-face meeting on numerous

4

occasions" yet "Nationstar sent [Plaintiff] a letter stating that [he] refused to have [such] a face-to-face meeting." *Id.* ¶¶ 95-96. To date, Nationstar "has not met with [Plaintiff] face-to-face as required by the FHA guidelines, the Deed of Trust, and Virginia law, despite his repeated requests for such a meeting." *Id.* ¶ 100. "[O]n or about September 27, 2014, Nationstar [or its agent, John Doe Company] . . . went to [Plaintiff's] house and posted on the front door a bright red door hanger," instructing Plaintiff to call Nationstar. *Id.* ¶ 105. "Nationstar made no attempt to meet with [Plaintiff] on the day it left the door hanger, despite the fact that [Plaintiff's niece] opened the door [to Nationstar]." *Id.* 107-108. SBA initially scheduled a foreclosure sale for September 17, 2014 but then ultimately rescheduled it to commence December 18, 2014. *Id.* ¶¶ 116, 117-118. No face-to-face meeting was attempted prior to the commencement of foreclosure on Plaintiff's property. *Id.* ¶ 111.

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Detailed factual allegations are not necessarily required, but the facts pled must be sufficient to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Moreover, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

## IV. DISCUSSION

5

### a. Parties Arguments

#### i. *Count I - Breach of Contract for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Count I of Plaintiff's Complaint alleges a breach of contract claim based Defendants' alleged breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 119-125. Plaintiff alleges that Defendants breached the implied covenant by: (1) refusing to timely credit payments to Plaintiff's mortgage account; (2) purposely assessing default related charges when he was no in default; (3) losing, ignoring, and refusing to properly board the permanent loan modification agreement; (4) providing false reasons for unilaterally refusing to board Plaintiff's loan modification more than three months after Plaintiff had accepted it; (5) providing deceitful and conflicting information about how to and for how much to make payments on his mortgage; and (6) returning properly tendered mortgage payments for false reasons and in order to put him into default. *See id.* ¶¶ 121.

In their Motion to Dismiss, Defendants raise several contentions that cut across Count I of the Complaint. To begin, Defendants maintain that Plaintiff fails to state a cause of action because his claim is outside the purview of the Uniform Commercial Code ("U.C.C.") and, as such, his claim fails as a matter of law. Defendants argue that Virginia law does not recognize an implied covenant of good faith and fair dealing in contracts outside of those governed by the U.C.C. Here, a Deed of Trust is involved and, Defendants argue that, because such a Deed of Trust is a secured instrument, it is not governed by the U.C.C. Rather, they argue, the instrument is governed by real property law. Additionally, Defendants specifically argue that Count I does not adequately state a claim for relief because there is no independent cause of action in the Commonwealth of Virginia for breach of the implied covenant of good faith and fair dealing.

In opposition, Plaintiff argues that Defendants' arguments are contrary to case precedent established by this Court and the Fourth Circuit. Plaintiff argues that Count I of the Complaint

6

certainly asserts a claim based on Defendants' alleged breach of the implied covenant of good faith and fair dealing because Virginia recognizes such a covenant in all contracts, both those rooted in common law and those governed by the U.C.C. Because it is a breach of contract claim, rather than a claim in tort, Plaintiff argues that he can assert breach of the implied covenant. Plaintiff argues, at great length, that the Court in *Harrison v. U.S. Bank Nat'l Ass'n*, No. 3:12CV224, 2012 WL 2366163 (E.D. Va. June 20, 2012), routinely relied upon by this Court to dismiss claims for breach of the implied covenant,[4] "failed to appreciate the difference . . . between a common law breach of fiduciary duty claim" and "a violation of the good-faith obligation in the U.C.C." Pl.'s Mem. at 6-7

In reply, Defendants energetically refute Plaintiff's contention that because he alleges his claim "as a breach of contract claim" rather than as a tort, he is entitled to bring his claim as an independent cause of cause. Say Defendants, regardless of the label Plaintiff places on his claim, the Virginia Supreme Court has yet to recognize any standalone cause of action for breach of implied covenant. Accordingly, because Plaintiff, in Defendants' view, attempts to assert a separate cause of action for breach of the implied duty of good faith, he fails to state a claim upon which relief may be granted under Virginia law. Alternatively, Defendants insist that, in Count I, Plaintiff alleges mere conclusory allegations of bad faith, not supported by any specific facts. Furthermore, Defendants contend that such conclusory allegations made by Plaintiff are contradicted by the permanent loan modification documents. Therefore, even if Plaintiff's claims of breach were permitted under Plaintiff's Deed of Trust, Defendants argue that he

---

[4] *See e.g., Hazaimeh v. U.S. Bank Nat. Ass'n*, No. 3:14-CV-813, 2015 WL 966034, at *21-22 (E.D. Va. Mar. 4, 2015) (Spencer, J.); *Jones v. Fulton Bank, N.A.*, No. 3:13-CV-126, 2013 WL 3788428, at *23 (E.D. Va. July 18, 2013) (Spencer, J.) (quoting *Harrison v. U.S. Bank Nat'l Ass'n*, No. 3:12CV224, 2012 WL 2366163 (E.D. Va. June 20, 2012) *aff'd*, 565 F. App'x 251 (4th Cir. 2014); *Bagley v. Wells Fargo Bank, N.A.*, No. 3:12-CV-617, 2013 WL 350527, at *19-20 (E.D. Va. Jan. 29, 2013) (Spencer, J.).

nevertheless fails to sufficiently allege a plausible claim of bad faith. In sum, then, Defendants argue that Count I of Plaintiff's Complaint must be dismissed because: (1) Plaintiff may not assert an independent claim for breach of the implied covenant of good faith and fair dealing; (2) even if the implied covenant exists generally in Plaintiff's Deed of Trust, Plaintiff's claim is improperly based upon Defendants' exercise of their contractual rights; and (3) Plaintiff's Complaint asserts nothing more than unwarranted inferences of Defendants' alleged lack of good faith and fair dealing.

      ii. *Count III – Violations of the Federal and Virginia Equal Credit Opportunity Act*

In relevant part, the ECOA provides "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2). In turn, an "adverse action" is defined as: "denial or revocation of credit, a change in terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." *Id.* §1691(d)(6). Adverse action, under the ECOA, does "not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit." *Id.*

With this brief background in mind, in Count III, Plaintiff alleges that Nationstar violated the federal and Virginia ECO because it did not "provide [Plaintiff] with an adverse action notice that contained a statement of reasons that his loan had been denied or provide him with the information required to obtain a statement of reasons for denial of the loan modification." Compl. ¶ 141. However, in response, Nationstar argues that it was relieved of its obligation to provide an adverse action notice because Plaintiff—by applying for a trial period plan and making reduced payments—was in default on his loan. Nationstar argues that the Complaint's allegations establish that Plaintiff was in default when Nationstar was relieved of any obligation under § 1691(d)(2) to deliver a statement of reasons for its adverse credit action.

Therefore, according to Nationstar, it was not required to provide any notice because the definition of "adverse action" in the ECOA "does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit." 15 U.S.C. § 1691(d)(6). Thus, Defendants essentially argue that Count III fails because Plaintiff cannot show an "adverse action" under the ECOA, and, to that end, no adverse action notice was required because of the ECOA's written notice requirement is triggered only in the event a creditor takes adverse action.

In response, Plaintiff insists that Nationstar's entire argument rests on a mischaracterization of the facts. Contrary to what Nationstar asserts—*i.e.*, that it denied Plaintiff a permanent loan modification—Plaintiff argues that the case *sub judice* does not involve a refusal to extend additional credit, as Nationstar charges, but rather a revocation of a valid, permanent modification agreement. Says Plaintiff, the Complaint plausibly alleges that he received a permanent loan modification from Nationstar in November 2013, which Plaintiff then accepted and timely returned to Nationstar. Thus, Plaintiff argues that Nationstar revoked the permanent modification agreement—*i.e.*, an "existing credit arrangement." When Nationstar, according to Plaintiff, inexplicably and unilaterally decided to revoke the existing credit arrangement, it was required to provide Plaintiff with an adverse action notice. Plaintiff relies on *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204 (9th Cir. 2013) in opposing Nationstar's efforts to dismiss this claim. He argues that the material facts in the present case mirror those contained in *Schlegel*. Here, Plaintiff argues, he accepted a permanent loan modification from Nationstar in November 2013. After he accepted the said permanent loan modification, Nationstar began rejecting his payments and treated the permanent loan modification agreement as terminated or revoked. Thus, says Plaintiff, contrary to Nationstar's argument, the exclusion language in § 1691(d)(2) was not triggered because Plaintiff was not seeking an extension of additional credit on an existing credit arrangement. Rather, Plaintiff argues that he

9

and Nationstar had an existing credit arrangement as of November 2013—*i.e.*, the permanent modification agreement.

In reply, Nationstar underscores that Plaintiff does not dispute that he was in default when he applied for the modification in the January 2013 or when Nationstar denied his application for a permanent loan modification in March 2014. Instead, Nationstar contends that Plaintiff's argument—*i.e.*, that his default status is irrelevant for purposes of the ECOA, which does not take into account an applicant's default status where the applicant suffers a "revocation of credit"—fails because Plaintiff's reliance on *Schlegel* is misplaced under the facts of the case at bar. Certainly, Nationstar agrees with Plaintiff in one respect: that he received permanent loan modification documents from Nationstar to be signed, notarized, and returned to Nationstar. However, in the instant case, unlike the facts in *Schlegel*, Nationstar argues, Plaintiff acknowledges in his Complaint that, when he contacted Nationstar after receiving the March 19, 2014 denying his request for permanent loan modification, he was informed that his loan modification documents were filled out incorrectly, notarized incorrectly, and missing a notary stamp. Therefore, to Nationstar, the facts of the instant matter do not mirror those in *Schlegel* since Nationstar claims that it did not board a permanent modification of Plaintiff's loan. Accordingly, Nationstar argues, neither the default notices nor the denial letter sent to Plaintiff constitute a "revocation of credit" under the ECOA. Rather, according to Nationstar, the facts indicate Nationstar's "refusal to extend additional credit under [Plaintiff's] existing credit arrangement." Accordingly, Nationstar argues that Plaintiff is unsuccessfully trying to circumvent the express definition provided by the ECOA by casting Nationstar's denial of a permanent loan modification as a "revocation of credit," which does not take into account an applicant's default status. Nationstar reiterates that because Plaintiff was undoubtedly delinquent and in default as to his mortgage loan, its action of sending Plaintiff the March 19, 2014 denial letter regarding a permanent loan modification does not qualify as an "adverse action" for purposes of the ECOA. In sum, because Plaintiff was "delinquent or otherwise in

default" both when he submitted the loan modification documents to Nationstar in November 2013 and when Nationstar denied the permanent loan modification in March 2014, Plaintiff suffered no "adverse action" that necessitated an adverse action notice under ECOA; as such, Nationstar insists that Count III of the Complaint must be dismissed.

## V. ANALYSIS

### i. *Count I - Breach of Contract for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Count I of the Complaint alleges a breach of contract claim based Defendants' alleged breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 119-125. Plaintiff alleges that Defendants breached the implied covenant by: (1) refusing to timely credit payments to Plaintiff's mortgage account; (2) purposely assessing default related charges when he was no in default; (3) losing, ignoring, and refusing to properly board the permanent loan modification agreement; (4) providing false reasons for unilaterally refusing to board Plaintiff's loan modification more than three months after Plaintiff had accepted it; (5) providing deceitful and conflicting information about how to and for how much to make payments on his mortgage; and (6) returning properly tendered mortgage payments for false reasons and in order to put him into default. *See id.* ¶¶ 121.

To establish a claim for breach of the implied covenant of good faith, a plaintiff must prove (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. *Id.* (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996)). But this implied covenant is not recognized "in contracts outside of those governed by the Uniform Commercial Code ("U.C.C."), and the U.C.C. 'expressly excludes the transfer of realty from its provisions.'" *Harrison v. U.S. Bank Nat'l Ass'n*, No. 3:12CV224, 2012 WL 2366163, at *2 (E.D. Va. June 20, 2012) (quoting *Greenwood Assocs., Inc. v. Crestar Bank*, 248 Va. 265, 270 (Va. 1994); *see also* Va. Code § 8.9A-109(d)(11) ("This title does not apply to

the creation or transfer of an interest in or lien on real property, including a lease or rents thereunder....").

Plaintiff has not sufficiently stated a claim for breach of an implied covenant of good faith and fair dealing. "Under Virginia law, every contract contains an implied covenant of good faith and fair dealing; however, a breach of those duties only gives rise to a breach of contract claim, not a separate cause of action." *Albayero v. Wells Fargo Bank, N.A.*, No. 3:11CV201, 2011 WL 4748341, at *15 (E.D. Va. Oct. 5, 2011) (quoting *Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc.*, 542 F.Supp.2d 452, 462 (E.D. Va. 2008)); see *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 466 S.E.2d 382, 385 (Va. 1996)("[T]he failure to act in good faith ... does not amount to an independent tort."). Assuming without deciding that Plaintiff has alleged a breach of contract claim stemming from a failure to act in good faith and fair dealing, it is of no matter because Virginia law "does not recognize an implied covenant of good faith and fair dealing in contracts outside of those governed by the Uniform Commercial Code (U.C.C.), and the U.C.C. expressly excludes the transfer of realty from its provisions." *Bagley v. Wells Fargo Bank, N.A.*, No. 3:12-CV-617, 2013 WL 350527, at *6 (E.D. Va. Jan. 29, 2013) (quoting *Harrison v. U.S. Bank Nat'l*, 3:12CV224, 2012 WL 2366163, at *2 (citation omitted); *Jones v. Fulton Bank, N.A.*, 565 F. App'x 251, 253 (4th Cir. 2014) ("[T]he UCC does not apply to transfers of real property") (citing *Greenwood*, 248 Va. at 270). In Virginia, "the Deed of Trust is a secured instrument which is *not* governed by the U.C.C," *Bagley*, No. 3:12CV617, 2013 WL 350527, at *6 (emphasis in original), but is instead governed by "the law of real property," *Gibson v. Wells Fargo Bank*, No. 1:10CV304, 2011 WL 221188, at *3 (E.D. Va. Jan. 19, 2011) *aff'd sub nom Gibson v. Wells Fargo Bank, N.A.*, 460 F. App'x 244 (4th Cir. 2012).

> ii. *Count III – Violations of the Federal and Virginia Equal Credit Opportunity Act*

Plaintiff's Complaint also raises a claim under the ECOA, which makes it illegal "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a)(1). One way that the ECOA effectuates this goal is through its notice requirement, which states: "Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." *Id.* § 1691(d)(2). "Adverse action" means "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." *Id.* § 1691(d)(6). "Adverse action" does *not* include "a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit." *Id.* The ECOA defines "credit" to mean "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." 15 U.S.C. § 1691a(d).

Plaintiff alleges that Nationstar violated the federal and Virginia ECOA through its failure to provide an adverse action letter after it revoked the permanent modification agreement that Plaintiff received. Pl.'s Mem. at 3; *see* Compl. ¶¶ 140-44. In response, Nationstar argues that it was relieved of its obligation to provide an adverse action notice because Plaintiff—by applying for a trial period plan and making reduced payments—was in default on his loan. Def.'s Mem. at 12. Therefore, says Nationstar, no "revocation of credit," for purposes of the definition of "adverse action" under the ECOA, occurred. *Id.* Rather, according to Nationstar, it was not required to provide any notice because the definition of "adverse action" in the ECOA "does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit." *Id.* (quoting 15 U.S.C. § 1691(d)(6).

Nationstar argues that Plaintiff himself alleges that he was behind in his mortgage payments. Nationstar cites cases holding that borrowers who make timely payments pursuant to a TPP and are then denied a permanent modification cannot state an ECOA claim because the borrowers were in default at the time the permanent modification was denied. Defs.' Mem. at 11 n.8 (citing *Pandit v. Saxon Mortg. Servs., Inc.*, 2012 WL 4174888, at *7 (E.D.N.Y. Sept. 17 2012) ("a denial of a HAMP loan modification does not trigger the ECOA's adverse action explanation requirement because the TPP did not alter the terms of Plaintiffs' underlying loan obligations."); *Eichholz v. Wells Fargo Bank, NA*, 2011 WL 5375375, at *9 (E.D. Mich. Nov. 7, 2011) ("The HAMP trial program did not modify Plaintiff's underlying mortgage obligations and Plaintiff was already in default on April 29, 2010, when Defendant notified Plaintiff of the modification decision.")); *id.* at 12 (citing *Guthrie v. Bank of America, Nat'l Ass'n*, 2012 WL 6552763, at *6 (D. Minn. Dec. 14, 2012) ("Plaintiffs do not dispute that they had defaulted on their mortgage by the time of their loan modification request. As a result, Bank of America's denial of this request did not amount to an 'adverse action,' and it did not trigger the ECOA.")).

However, the Court is not persuaded by Nationstar's argument that the aforementioned authority compels dismissal of Plaintiff's ECOA claim at this stage. The case *sub judice* is distinguishable from *Guthrie*, *Pandit*, and *Eichholz*, the case law cited by Nationstar, because, here, Plaintiff alleges that his loan had been permanently modified and that he performed as required by the permanent loan modification agreement. Specifically, for example, he alleges that "[]n November 2013, [he] received permanent Loan Modification documents from Nationstar, to be signed, notarized, and returned to Nationstar . . . ." Compl. ¶ 41. Therefore, unlike the cases cited by Nationstar, Plaintiff, here, alleges that he properly executed and accepted the permanent loan modification document and "timely returned it [via FedEx] to Nationstar." *Id.* Instead, this case is similar to *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204 (9th Cir. 2013). In *Schlegel*, the Ninth Circuit reversed a dismissal of an ECOA claim and held that the facts alleged gave rise to a claim that the bank, in that case, revoked the plaintiff's

credit for purposes of § 1691(d)(6). *Id.* at 1211. There, the complaint alleged that the plaintiffs obtained a loan modification as part of their court-ordered bankruptcy proceedings, but the bank later informed plaintiffs that payments made under the modification were in default. *Id.* at 1206-07. The bank sent several default notices and accelerated the plaintiff's loan payments. *Id.* The Ninth Circuit held that the default notices and acceleration were, effectively, "a revocation of [the] credit" that was extended in the loan modification agreement. *Id.* at 1211. As such, the Ninth Circuit concluded that "the facts alleged plausibly give rise to the claim that Wells Fargo terminated the loan modification agreement and thereby revoked the Schlegels' credit for purposes of § 1691(d)96). *Id.* 1211. Like the plaintiffs in *Schlegel*, Plaintiff challenges the alleged revocation of an executed modification agreement, not the denial of a permanent modification following a TPP, as in *Guthrie*, *Pandit*, and *Eichholz*. Plaintiff adequately alleges that he complied with the requirements of the permanent loan modification agreement, especially by alleging the following in his Complaint:

> [T]o ensure proper execution of the Loan Modification documents, [Plaintiff] took them to Carter Bank and Trust and went through all the documents with Jill Coakley, a bank teller. He signed and notarized the Loan Modification documents. Ms. Coakley assisted [Plaintiff] from start to finish. The documents were timely sent to Nationstar via FedEx by [Plaintiff's] sister. [Plaintiff] continued to make timely payments of $575.90 to Nationstar Mortgage. . . . [After receiving a letter on March 19, 2014, stating that his loan modification has been denied because the offer was not accepted by Plaintif or because Plaintiff withdrew his request and after receiving several Notices of Default, Plaintiff] called Nationstar Mortgage numerous times regarding the notices of default and always got a different Nationstar representative who gave him a different answer . . . . [Plaintiff] called Nationstar Mortgage and spoke with Laura, who advised he didn't qualify for trial loan modification because he didn't make the payments. She stated the Loan Modification documents were filled out incorrectly, notarized incorrectly, [and] missing [a] notary stamp. This was all untrue [because Plaintiff] accepted the loan modification in writing and had not withdrawn his application. Not only had he completed the TPP successfully, he was offered and had accepted a written Loan Modification, which he return[ed] to Nationstar as instructed.

Compl. ¶¶ 41, 42, 46, 54, 57, 58. These allegations sufficiently claim that Plaintiff did what was required by the permanent loan modification agreement, and, as such, he adequately alleges

15

Case 3:14-cv-00837-MHL Document 22 Filed 07/28/15 Page 16 of 16 PageID# 163

compliance with the said agreement. Assuming the truth of Plaintiff's allegations, as the Court must at this juncture, Plaintiff's allegations concerning his compliance with the instructions surrounding the permanent loan modification agreement sent by Nationstar strengthen his claim that that they entered into a valid permanent loan modification agreement, which was then revoked. Thus, Plaintiff's allegation that Nationstar took adverse action by revoking the permanent loan modification agreement states a claim under the ECOA.

## VI. CONCLUSION

For the aforementioned reasons, Defendants' Motion will be GRANTED IN PART as to Count I of the Complaint and DENIED IN PART as to Count III.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record and to Plaintiff. An appropriate Order shall issue.

/s/
James R. Spencer
Senior U. S. District Judge

ENTERED this 28th day of July 2015.

16